# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                 Case No. 11-20551-12

SARDAR ASHRAFKHAN,

    Defendant.
                                                   /

## OPINION AND ORDER DENYING MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

Defendant Sardar Ashrafkhan was convicted by jury trial of conspiracy to distribute controlled substances, health care fraud conspiracy, and money laundering. (Dkt. # 1158.) Before the court are three motions filed by Defendant Sardar Ashrafkhan. Defendant filed his Motion for Judgment of Acquittal on June 29, 2015. (Dkt. # 1144.) Following his conviction, Defendant filed a Renewed Motion for Judgment of Acquittal (Dkt. # 1164) and a Motion for New Trial (Dkt. # 1165) on July 9, 2015, substituted with a Supplemented Motion for a New Trial (Dkt. # 1247) filed on August 27, 2015. The motions for judgment of acquittal are fully briefed, the government having responded orally at the sentencing hearing with regard to the motion for new trial. For the reasons stated at the sentencing hearing and those below, the court denies both motions.

## I. BACKGROUND

Defendant was a medical doctor who owned and operated Compassionate Doctors, P.C. ("Compassionate"). (Dkt. # 1164, Pg. ID 8160.) Defendant, along with numerous other doctors, pharmacists, and others, was charged with various offenses

relating to a conspiracy to illegally distribute large quantities of prescription pain medication on March 20, 2013. (Dkt. # 187.) In particular, Defendant was charged with one count of conspiracy to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846; one count of health care fraud conspiracy under 18 U.S.C. §§ 1347 and 1349; and two counts of money laundering under 18 U.S.C. §§ 1957. On July 2, 2015, Defendant was convicted of all counts. (Dkt. # 1158.) Shortly after, Defendant timely filed the instant motions.

## II. STANDARD

The court may enter a judgment of acquittal if the evidence presented at trial is insufficient to support a conviction. Fed. R. Crim. P. 29. "In reviewing challenges regarding the sufficiency of the evidence presented to the jury, [the court is] limited to ascertaining whether, viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Carmichael*, 232 F.3d 510, 519 (6th Cir. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); citing *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)) (internal quotation marks omitted). A court must therefore "draw all available inferences in favor of the jury's verdict." *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998) (citing *United States v. Smith*, 39 F.3d 119, 121 (6th Cir. 1994)). Moreover, "'[s]ubstantial and competent' circumstantial evidence by itself may support a verdict and need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)). Thus, "[a] defendant bringing such a challenge bears a 'very heavy

burden.'" *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir. 1986)).

Rule 33 allows the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Sixth Circuit gives trial courts broad discretion in determining whether to grant a new trial pursuant to Rule 33 because "'[t]he trial judge is in the best position to determine . . . appropriate remedies for any demonstrated misconduct.'" *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008) (quoting *Unite States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995)). When a defendant rests his argument for a new trial on the basis of cumulative error, he must show that the "combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (citing *United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993)) (finding only harmless error when a trial judge admitted hearsay statements of government agents); *see also Wheaton*, 517 F.3d at 361 (affirming a denial of a motion for new trial because no prejudice resulted from juror's misconduct in which the juror looked at a map to determine the distance between two towns).

### III. DISCUSSION

Defendant argues that he is entitled to judgment of acquittal on the conspiracy charges because the government provided insufficient evidence at trial that "Defendant was **even aware** of the conspiracy when it was occurring, much less that he **intended** to join it, or even less, that he **did** join it. (Dkt. # 1164, Pg. ID 8160 (double emphases in original).) Defendant apparently does not challenge his conviction for money laundering. In addition, Defendant argues that he is entitled to a new trial because the government

3

"committed prosecutorial misconduct during the closing and rebuttal arguments by misstating material evidence . . . and purporting facts that were not introduced evidence, which were prejudicial to Defendant." (Dkt. # 1247, Pg. ID 9771.) Each argument will be addressed in turn.

### A. Conspiracy

Defendant challenges both conspiracy convictions: (1) conspiracy to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846; and (2) health care fraud conspiracy under 18 U.S.C. §§ 1347 and 1349. Defendant makes the same argument for both counts: that the government failed to offer sufficient evidence to demonstrate beyond a reasonable doubt that Defendant was aware of and intentionally entered such conspiracies. The court disagrees.

### 1. Count 1: Drug Conspiracy

To establish a drug conspiracy, the government must prove (1) an agreement to violate the drug laws, (2) knowledge of and intent to join the conspiracy, and (3) participation in the conspiracy. *United States v. Sanchez*, 928 F.2d 1450, 1457 (6th Cir. 1991). The government need not prove the existence of a formal agreement to establish a conspiracy — proof of a tacit understanding among the parties is sufficient. *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir. 1985). "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* at 1026 (citing *United States v. Strong*, 702 F.2d 97 (6th Cir. 1983); *United States v. Mendez*, 496 F.2d 128 (5th Cir. 1974)). The government is not required to prove an overt act in furtherance of the conspiracy under § 1346. *U.S. v. Patel*, 579

Fed. Appx. 449, 460 (6th Cir. 2014) (citing *United States v. Shabani*, 513 U.S. 10, 15 (1994)).

Evidence of this kind of "tacit understanding" abounds. Defendant owned Compassionate, the locus of the conspiracy. For instance, Verdell Lovett, a marketer paid by Defendant, testified that Defendant knew Lovett was selling Oxycontin pills on the street. (Dkt. # 1122, Pg. ID 6571.) Specifically, Lovett testified that Defendant did not want to pay Lovett for the therapy services Lovett provided patients because Defendant knew that all of those patients were also on Oxycontin and Lovett was making money selling the Oxycontin pills on the street. (Dkt. # 1120, Pg. ID 6322.) In a recording played at trial, Defendant told Lovett he was looking to sell OxyContin to patients outside of Detroit, where it was less "hot." (Dkt. # 1120, Pg. ID 6321.)

Ali Malik testified that Defendant knew Compassionate's "patients" wanted controlled substances and stated the Compassionate doctors should prescribe them because the patients would eventually get it from somewhere else. (Dkt. # 1138, Pg. ID 7738-39.) Malik, who is not a licensed doctor, also testified that Defendant paid him to see patients without a licensed doctor present and wanted him to do it "discreetly" to keep it secret from the licensed doctors. (Dkt. # 1138, Pg. ID 7741-43.)

Ravi Iyer testified that, when he told Defendant he did not want to participate in the patient parties anymore because "we're not doing any real medicine out here[,]" Defendant told Iyer not to go out and see patients anymore, but to come into the office once or twice a week to sign off on stacks of charts filled out by unlicensed medical graduates. (Dkt. # 1468, Pg. ID 14675-77.) Iyer also testified that Defendant directed him to write prescriptions for 80 mg OxyContin for patients he never saw, and to pre-

5

sign blank prescription pads. (*Id.* at Pg. ID 1468.) When Iyer approached Defendant with a suggest about how to make the "she[e]r volume of drugs being prescribed" appear more legitimate, which was "definitely an attempt to protect ourselves in the event of an audit[,] Defendant "embraced" the idea. (*Id.* at Pg. ID 14687.) Defendant attended the presentation Iyer gave on how to make the charts appear legitimate. (*Id.*)

Defendant's motion principally aims to shift the liability from Defendant to Ali Malik. Lovett described Defendant as the "godfather" of the conspiracy, with Malik as his "underboss" who was the "next man up after [Defendant]." (Dkt. # 1120, Pg. ID 6247.) Defendant complains that Malik was the real godfather, and Malik's was the only testimony to claim that Defendant ever had knowledge of the conspiracy. (Dkt. # 1164, Pg. ID 8161-62.)

Defendant's argument that Malik was an "unreliable witness" (*Id.* at n.1) must fail, because the court does not weigh the credibility of witnesses on a rule 29 motion. *United States v. Bond*, 22 F.3d 662, 667 ("The credibility of witnesses is exclusively the province of the jury") (citing *United States v. Schultz*, 855 F.3d 1217, 1221 (6th Cir. 1988)); *see also United States v. Gallo*, 763 F.3d 1504, 1518 (6th Cir. 1985) *cert. denied*, 475 U.S. 1017 (1986) (noting that "even the uncorroborated testimony of a single accomplice may support a conviction" under federal law).

In any event, as set out above, Malik was not the only witness to testify as to Defendant's involvement in, and direction of, the drug conspiracy. In addition, the government presented ample testimony about Defendant's kickback agreements with pharmacies and Defendant's inflation of Medicare and Medicaid payments that inured to him as sole controller of Compassionate's main checking account. Taken together, the

6

evidence presented at trial was more than enough for a reasonable jury to find beyond a reasonable doubt that Defendant knew of, intended to join, and in fact directed a conspiracy to distribute narcotics in violation of the drug laws. Defendant's motion fails to meet the "very heavy burden" imposed by Rule 29, *Daniel*, 329 F.3d at 485, and the court denies it accordingly.

### 2. Count 2: Health Care Fraud Conspiracy

Any person who conspires to commit health care fraud may be convicted of a federal offense under 18 U.S.C. § 1349. An individual commits health care fraud by "knowingly and willfully execut[ing] or attempt[ing] to execute a scheme or artifice . . . to defraud any health care benefit program[] or . . . to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery or payment for health care benefits, items, or services." 18 U.S.C. § 1347(a). A person who commits health care fraud "need not have actual knowledge" of the statute forbidding the conduct "or specific intent to commit a violation" of the statute. 18 U.S.C. § 1347(b).

To establish a health care fraud conspiracy under § 1349, the government must prove an agreement between two or more people to act together to commit the offense. *Patel*, 579 Fed. Appx. at 460-61 (citing *United States v. Rogers*, 769 F.2d 372, 379-82 (6th Cir. 2014)). Like with drug conspiracies, it is not necessary to show a formal agreement. Rather, "it is sufficient to demonstrate a tacit or mutual understanding among the parties." *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (citation omitted). "Likewise, direct evidence of the conspiracy is not necessary. It is enough to

present circumstantial evidence which a reasonable person could interpret as showing participation in a common plan[.]" *Id.* (internal citations omitted).

There is no dispute that there was an ongoing conspiracy at Compassionate, which Defendant owned, to run a "pill farm" in violation of the drug laws and defraud Medicare and Medicaid. Lovett testified that Defendant was the "godfather" who "ran everything" with Malik as his "underboss." (Dkt. # 1120, Pg. ID 6247.) As discussed above, Iyer testified that Defendant told him he did not have to participate in the patient parties but could instead fill out forms for patients he did had not seen and Defendant "embraced" Iyer's suggestions for ways to make the volume of narcotics being prescribed appear more legitimate in the event of scrutiny.

In addition to the bogus prescriptions for which reimbursement was sought, several witnesses testified to Defendant's insistence that all patients prescribed painkillers also be referred for physical therapy, whether or not they needed physical therapy. (*Id.* at Pg. ID 6240-41; Dkt. # 1124, Pg. ID 6981-85; Dkt. # 1468, Pg. ID 14692.) Iyer testified that these physical therapy referrals were made for business reasons, not medical reasons. (Dkt. # 1468, Pg. ID 14690-91.) Lovett testified that the patients "didn't need or require therapy at all" (Dkt. # 1120, Pg. ID 6239), and that he was paid $300 to $500 by Defendant for each referral. (*Id.* at Pg. ID 6240.) Patients were referred to Galaxy Home Health, Preferred Home Health, and Procare Home Health Services, all of which were controlled by Defendant but held under the names of others, such as his wife and son. (Dkt. # 1454, Pg. ID 12857-60.) Lovett testified that Defendant told him to open a marketing company so Defendant could write checks to a business that appeared "legit[,]" rather than to a drug dealer. (Dkt. # 1120, Pg. ID 6324.)

The therapy sessions these patients were referred for, but did not need, were never performed. Lovett testified that patients would sign eight "re-visit" forms at a time during signing parties hosted by Defendant's employees. (Dkt. # 1120, Pg. ID 6239.) These bogus forms would then be submitted for reimbursement to Medicare or Medicaid, the revenue from which would inure to Compassionate or one of Defendants' other companies and, as owner, to Defendant. Thus, while Defendant argues that there is no evidence he profited from the street sales of the narcotics (Dkt. # 1246, Pg. ID 9766), substantial evidence was presented at trial that Defendant profited substantially from the reimbursements for the bogus prescriptions and for the referrals to his own companies for unnecessary physical therapy that was never performed, but Defendant both demanded and was paid kickbacks. The physical therapy patients, of course, were the same ones brought by the marketers for bogus narcotics prescriptions.

Taken together, even before considering the testimony of Ali Malik, all of the above represents more than enough evidence admitted at trial for a reasonable jury to find beyond a reasonable doubt that Defendant knew of, and intentionally participated in, a health care fraud conspiracy. Malik testified that Defendant told him how to fill out a billing sheet (Dkt. # 1138, Pg. ID 7732), and told him not to worry if he missed something because Defendant's biller would "go ahead and take care of it so we can get the most money out of each patent's insurance . . . . which was Medicare." (*Id.* at Pg. ID 7733.) Malik also testified that, although he was unlicensed, Defendant told him to see patients, fill out charts, and prescribe medication on his own but do it "discretely." (*Id.* at Pg. ID 7740-41.) Malik would deliver fifty or sixty charts directly to Defendant at a time, being careful to ensure that other doctors and unlicensed foreign graduates would

not see him. (*Id.* at Pg. ID 7741-42.) Because Malik was unlicensed, he could not appear on the billing, so Defendant would split up Malik's "patients" among actual licensed doctors, even though these doctors had nothing to do with the patients. (*Id.* at 7743-44.) Malik also testified that he would get the pre-signed prescription pads for which Defendant would pay Kelly, Iyer, and Pamatmat. (*Id.* at Pg. ID 744-49.)

Defendant argues that the court should discount the testimony of various government witnesses and credit the testimony of various defense witnesses. But, as discussed above, questions of witness credibility are "exclusively the province of the jury." *Bond*, 22 F.3d at 667. Defendant was free to challenge the credibility of these witnesses at trial, and did so. The court is "limited to ascertaining whether, in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Carmichael*, 232 F.3d at 519 (emphasis in original). In this light, and bearing in mind that substantial and competent circumstantial evidence by itself may support a guilty verdict, *Lee*, 359 F.3d at 418, the court has no difficulty finding that Defendant has failed to meet his heavy burden under Rule 29, and denies the motions with respect to the healthcare fraud conspiracy count as well respect as well.

## B. New Trial

Defendant grounds his motion for a new trial in a variety of allegedly improper statements made by the prosecutor, primarily during closing and rebuttal argument. (Dkt. # 1247.) Reviewing allegations of prosecutorial misconduct is a two-step inquiry. *United States v. Wells*, 623 F.3d 332, 337-38 (6th Cir. 2010). First, the court must determine whether the statements were improper. *Id.* If they were, the court must

determine whether the comments were flagrant enough to warrant reversal. *Id.* Whether an improper statement was flagrant depends on four factors: "(1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused." *Id.* (quoting *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008)). "[P]rosecutorial misconduct cannot support a grant of a new trial unless it is 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.'" *Bond*, 22 F.3d at 667 (quoting *United States v. Payne*, 2 F.3d 706, 712 (6th Cir. 1993) (per curiam). "The Supreme Court has instructed that a prosecutor's comments must be viewed in context, and that [i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 11-12 (1985)).

First, Defendant contends that the government "misrepresented the May 12, 2009 undercover recording of Dr. George England in an improper attempt to salvage or bolster the Government's Exhibit 19." (Dkt. # 1247, Pg. ID 9777.) The government used exhibit 19 in its effort to establish that Compassionate engaged in "back billing" for 17 nominee patients "inserted" into Compassionate by the government's cooperators. Defendant objects to the following statement by the prosecutor:

> What did you just hear? Dr. Khan. Do you remember on that tape he's promising Dr. England, I need you to go to Grand Rapids. I want to expand out here. I want you to go set up things in Grand Rapids. What did he tell him? You go and you do this and you see the patients and the billing sheets come to me. Why is that important that the billing sheets goes to Dr. Khan? Because some of the things you saw in Exhibit 19,

11

some of the billings that they are going to make. They are going to bill for things that are home visits, when they are really office visits. They are going to improperly bill for things. Why is he asking him if he's seeing people in Grand Rapids to send the billing sheets to him and you know Compassionate is in Southfield. The Compassionate way. The Compassionate model. Methink counsel doth protest too much.

(Dkt. # 1156, Pg. ID 8102.)

Defendant argues that its witness testimony established that there was no back billing, so the prosecutor's statements characterizing the tape are misleading. Defendant's counsel originally raised this objection orally after the close of the prosecutor's rebuttal argument. (Dkt. # 1460, Pg. ID 14247-48.) The court denied the motion from the bench, explaining that the "motion for mistrial is inapposite. It's, again, it's the stuff of supplemental or sur[-]rebuttal argument. It's interpretations of evidence. There was nothing argued outside of evidence." (*Id.*) Defendant's supplemented motion (Dkt. # 1247) is denied for the same reason.

The government offered evidence to show that Compassionate practiced a variety of improper billing practices. For instance, even the complained-of statement specifically identifies "bill[ing] for things that are home visits, when they are really office visits." (Dkt. # 1156, Pg. ID 8103.) Even if the court were to assume that Defendant's witnesses irrefutably established that the *timing* of the billing was proper, the complained-of statement does not refer to back billing, it refers to generic improper practices, and specifically billing for home visits that were not home visits. The court finds that this statement was not improper.

Next, Defendant contends that the prosecutor "mischaracterized illegal activities that actually occurred at or on behalf of Ali Malik's company . . . as being perpetrated by Compassionate." (Dkt. # 1247, Pg. ID 9779.) Defendant's theory relies on the premise

12

that the doctors could not have been working for Compassionate for a time period unless the government's "check summary" exhibit showed a check from Compassionate corresponding to that time period. Specifically, Defendant complains about Dr. Faraj Ghabag and Dr. Geralt.

The court rejects this argument in its order resolving outstanding objections to the presentence report, and does so here for the same reasons. Briefly stated, the IRS agent who sponsored the admission of the check summary testified to several different corporations and bank accounts, and stated she had not found all of Defendant's accounts. (Dkt. # 1468, Pg. ID 14954.) Additionally, Iyer, Geralt, and Pamatmat all testified that they worked for Compassionate during periods of time for which no checks appear in the check summary or were produced in evidence. (*See, e.g.*, Dkt. # 1453, Pg. ID 12831.)

Here, Tiffany Walker testified repeatedly that Faraj worked for Compassionate at the time and the sheets were all attributable to Compassionate. (Dkt. # 1122, Pg. ID 6630-41.) In fact, Walker testified to having seen Faraj writing in and signing the charts. (*Id.* at Pg. ID 6641.) Defendant argues that Walker believed Faraj to have been with Compassionate because that is what Malik told her. (Dkt. # 1247, Pg. ID 9782.) In reality, Defendant argues, Faraj was with Visiting Doctors of America, a competing pill farm that Malik started. But on redirect, Walker testified that Malik told her he was "getting ready to open up a company and for to see [sic] if we wanted to over there and work with him and leave Compassionate." (Dkt. # 123, Pg. ID 6961.) At the time Malik was telling Walker this, Walker testified, Malik—and by implication, Faraj—was still with Compassionate. (*Id.*) Defendant complains that Walker's only knowledge of this comes

13

from statements made by Malik, but statements made by a coconspirator during and in furtherance of the conspiracy are substantive evidence, not hearsay. FRE 801(d)(2)(E).

Defendant's remaining arguments are similarly devoid of merit. As the court explained at the sentencing hearing, Defendant does not identify improper statements by the prosecutor so much as he disagrees with the prosecutor's interpretation of evidence in the record. Such complaints do not establish misconduct, let alone misconduct "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *Bond*, 22 F.3d at 667. For this reason, and those stated on the record during the sentencing hearing, Defendant's motion for a new trial is denied.

## IV.  CONCLUSION

IT IS ORDERED that Defendant's motions for judgment of acquittal (Dkt. ## 1144, 1164) and motions for new trial (Dkt. ## 1165, 1247) are DENIED.

                                                s/Robert H. Cleland          /
                                                ROBERT H. CLELAND
                                                UNITED STATES DISTRICT JUDGE

Dated:  June 29, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 29, 2017, by electronic and/or ordinary mail.

                                                s/Lisa Wagner          /
                                                Case Manager and Deputy Clerk
                                                (810) 292-6522