UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>v.<br><br>D-12 SARDAR ASHRAFKHAN,<br><br>   Defendant. | Case No. 11-20551<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO VACATE UNDER 28 U.S.C. § 2255 [1997, 2049]**

This criminal case arises out of the operation of Compassionate Doctors, a medical clinic that was acting as a "pill mill" where fraudulent prescriptions were written for large quantities of opioids that were billed to Medicare and ultimately sold on the street. Three of the 54 indicted defendants went to trial. This included the owner of Compassionate Doctors and reputed "godfather" of the operation, Sardar Ashrafkhan.

At trial, the government endeavored to show that Ashrafkhan had full knowledge of the illegal activities at Compassionate Doctors and that he was the mastermind behind the scheme. The government made its case primarily through six cooperating witnesses, video recordings, records seized from search warrants, and financial analysis showing that Ashrafkhan made millions of dollars from fraudulent Medicare billings. And the government's efforts were successful. Ashrafkhan was convicted of conspiracy to distribute controlled substances, health care fraud

conspiracy, and two counts of money laundering. He was sentenced to 23 years of imprisonment. His convictions and sentence were affirmed by the Sixth Circuit.

After his unsuccessful appeal, Ashrafkhan changed course. He filed a post-conviction motion under 28 U.S.C. § 2255 seeking a resentencing. (ECF No. 1997.) He asserted ineffective assistance of counsel and claimed that, but for this ineffectiveness, he would have pled guilty rather than go to trial; thus, he argued he should be resentenced under the terms of the government's pre-trial plea offer. But recently, he changed course again. Following the Supreme Court's ruling in *United States v. Ruan*, 142 S. Ct. 2370 (2022), he sought to supplement his § 2255 motion and vacate his convictions, claiming error in the jury instructions. (ECF No. 2049.)

Finding no basis to vacate either the convictions or the sentence, the motions will be DENIED.

## I.

The Sixth Circuit issued two opinions in connection with Ashrafkhan's direct appeal to address different issues. *United States v. Ashrafkhan*, 964 F.3d 574 (6th Cir. 2020); *United States v. Ashrafkhan*, 821 F. App'x 428 (6th Cir. 2020). Each contains a vivid recitation of the facts. The synthesized version is suitable for the present motions, so the Court borrows it here:

> Sardar Ashrafkhan was the owner of Compassionate Doctors ("Compassionate"), a medical clinic he established in 2006. Although from the outside, Compassionate appeared to be a real clinic that provided legitimate services, the government alleged that it was nothing more than a "pill mill"—a sham clinic where unethical doctors would prescribe large quantities of opioids to individuals who did not need them. The opioids were later sold on the street and Compassionate

> would bill Medicare for the fake "patient visits" that had supposedly occurred.
>
> The scheme was simple. Compassionate would pay associates whom it called "marketers"—generally small-time criminals or drug dealers—to recruit fake patients to the clinic. These patients were not ill, nor did they visit Compassionate for any real treatment. Instead, Compassionate's doctors would write fraudulent prescriptions for the "patient," often without conducting any medical examination or even seeing the patient at all. Compassionate would then bill the patient's health insurance (Medicare) for the "visits," while the "marketers"—in addition to the money they received from Compassionate for recruiting fake patients—would earn money by filling the fake prescriptions and selling the drugs on the street. From January 1, 2007 to January 10, 2013, Compassionate filed 65,649 Medicare Part B claims for patient visits and related procedural care, claiming over $10 million in reimbursement, of which they were ultimately paid over $6.5 million. During the same period, the government alleged that Compassionate's prescriptions resulted in approximately 500,000 doses of controlled substances being distributed onto the illegal market. As the owner and operator of Compassionate, Ashrafkhan benefited handsomely from the scheme. Between 2008 and 2010, alone, Ashrafkhan deposited more than $2 million from Compassionate's business account into his own personal account. When he was arrested in 2013, the government also seized over $1 million in assets.

*Ashrafkhan*, 964 F.3d at 577.

Following a seven-week trial, Ashrafkhan was convicted of all counts. (ECF No. 1158.) He was sentenced to an aggregate term of 276 months' imprisonment: 240 months for the drug-distribution conspiracy count, 120 months for the healthcare-fraud conspiracy count—with 36 months to run consecutively and the remaining 84 months to run concurrently—and 120 months for the two money-laundering counts, to run concurrently. (ECF No. 1671.) His convictions and sentence were affirmed by the Sixth Circuit. *Ashrafkhan*, 964 F.3d at 577; *Ashrafkhan*, 821 F. App'x at 431.

3

Now Ashrafkhan moves to vacate his convictions and sentence pursuant to 28 U.S.C. § 2255. (ECF Nos. 1997, 2049.) The government opposes the motions. (ECF Nos. 2006, 2059.) Following the retirement of the presiding District Judge, Robert H. Cleland, and the reassignment of this case, the undersigned will rule on the motions.

## II.

To prevail on his § 2255 motions, Ashrafkhan must show that the sentence imposed was "in violation of the Constitution or laws of the United States" or "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003)); *see also Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) ("[A] petitioner must demonstrate the existence of an error of constitutional magnitude which has a substantial and injurious effect or influence on the . . . jury's verdict."). Ineffective assistance of counsel claims are an appropriate basis for relief under § 2255. *See United States v. Caver*, 470 F.3d 220, 250 (6th Cir. 2006).

In evaluating a § 2255 motion, an evidentiary hearing is not required if the defendant's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation

4

marks and citation omitted). In other words, a hearing is not necessary if the motion, record of prior proceedings, and governing law "conclusively show that [defendant] is entitled to no relief." 28 U.S.C. § 2255(b); *see* Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255, Rule 4(b) (amended 2019). While Ashrafkhan and his trial counsel have submitted competing affidavits on the issue of deficient performance, the record with respect to prejudice is not disputed and does not require a hearing.

## A.

Ashrafkhan's opening motion was clear. He wanted to be resentenced as if he had accepted the government's pretrial plea offer. (ECF No. 1997, PageID.20847.) Ashrafkhan averred that he would have pled guilty if his trial counsel had warned him he would face (1) "a possible guidelines range of life imprisonment if convicted at trial," (2) "statutory maximums totaling 50 years if convicted at trial," and (3) "deportation as a collateral consequence of conviction at trial." (*Id.* at PageID.20869–20870.)[1] Instead, says Ashrafkhan, he was misadvised that he would win at trial, that he faced a maximum of 20 years in the unlikely event he was convicted, and that he would not be deported if convicted. (*Id.* at PageID.20856–20858.)

To prevail on an ineffective assistance of counsel claim, a defendant must establish that counsel's performance was deficient and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate

---

[1] Because the Court has considered Ashrafkhan's affidavit, his motion to expand the record (ECF No. 1998) is GRANTED.

prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

The Sixth Amendment right to the assistance of counsel during criminal proceedings extends to the plea-bargaining process. *Missouri v. Frye*, 566 U.S. 134, 143–44 (2012). Thus, criminal "defendants are 'entitled to the effective assistance of competent counsel'" during that process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). To establish ineffective assistance in the plea-bargaining process, the defendant must show not only that his attorney's performance was deficient but also that the outcome of the plea process would have been different with competent advice. *Id.*

The Court, however, "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *McQueen v. Scroggy*, 99 F.3d 1302, 1315 (6th Cir. 1996) (omissions in original) (citing *Strickland*, 466 U.S. at 697), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004). That is the situation here, so the Court will go straight to prejudice.

### B.

Irrespective of the information Ashrafkhan claims he received from his counsel, the government and the Court made sure he was aware of the maximum

6

penalties he faced if convicted at trial as well as the risks of proceeding to trial versus accepting the government's plea offer.

Start with Ashrafkhan's arraignment. His counsel at the time—not the one he now claims was ineffective—advised the magistrate judge that he discussed "the charge and the maximum sentences" with Ashrafkhan. (ECF No. 2003, PageID.20883.) The magistrate judge also advised Ashrafkhan of the maximum penalties he faced on each count. (*Id.*) And Ashrafkhan signed an acknowledgment of the second superseding indictment in which he represented that he knew that if he was convicted he could be sentenced to a maximum of 20 years' imprisonment on count 1 and to maximums of 10 years' imprisonment on each of counts 2, 9, and 10. (ECF No. 244.) What is more, Ashrafkhan earned a Ph.D. with a research focus on pathology and the genetics of cancer. *Ashrafkhan*, 964 F.3d at 575. There is no basis to find he did not understand the maximum sentence he was facing with a conviction.

Perhaps more important than focusing on the maximum sentence, which Ashrafkhan did not receive, Judge Cleland made sure that Ashrafkhan understood the possible guidelines ranges he was facing upon conviction either with or without a plea deal. (ECF No. 1443.) At the final pretrial conference, conducted less than two weeks before trial, Judge Cleland specifically stated:

> But in order, also, to avoid the potential of a Defendant choosing to go to trial, being convicted, and then subsequently complaining that he did not know the enormity of the guideline range calculation or the significance of the conviction, I think that it is extremely important to lay out with even more specificity than you have thus far what the Government believes to be a sentencing range that a Defendant in Number 12's position [Ashrafkhan] would likely face, and then what—

7

> the outline of what was proffered in the way of discussion, and then Mr. Crandall [can] react to it on behalf of his client.
>
> And I want the client to specifically say that he understands the situation, that his eyes are open, and that if he chooses to go to trial he knows what he is at least potentially facing.

(*Id.* at PageID.11635–11636.) In response, the government further explained that its estimated guidelines range was 22 to 25 years after a trial as opposed to 11 to 13 years under the plea offer discussed. (*Id.* at PageID.11636.) Defense counsel confirmed that was his understanding as well and that the terms were discussed with Ashrafkhan. (*Id.* at PageID.11637.) Ashrafkhan was present for this on-the-record discussion which made clear that the maximum possible sentence exceeded 20 years. And when Judge Cleland asked Ashrafkhan, "You understand the possible significance of sentencing calculations at trial versus different and lower sentencing calculations that may be a possibility based upon the discussion between your attorney and the Government attorney?" Ashrafkhan responded, "Yes." (*Id.* at PageID.11638.) He also told the Court it was "entirely his choice" to proceed to trial. (*Id.* at PageID.11638–11639.) He raised no concerns or questions. And, as the government rightly points out, Ashrafkhan "is a mature and highly educated man who has lived in the United States since June of 1991. He knows no one can guarantee the outcome of a criminal trial." (ECF No. 2006, PageID.20898.)

Lastly, based on the nature of the charges, Ashrafkhan was facing deportation from any conviction, whether by jury or guilty plea. More specifically, the plea deal offered by the government required Ashrafkhan to plead to the controlled substance conspiracy count and one of the money laundering counts. (ECF No. 1443,

8

PageID.11634.) These were two of the three offenses Ashrafkhan was ultimately convicted of and subject to deportation for. (ECF No. 2006, PageID.20899.) Pleading guilty to these offenses would have also subjected him to deportation.

In sum, Ashrafkhan was advised of his sentencing exposure and the risks of proceeding to trial. And he faced deportation whether he was convicted at trial or by guilty plea. Thus, he has not demonstrated that but for his counsel's deficient advice there was a reasonable probability he would have entered a guilty plea.[2]

### III.

Wholly apart from seeking resentencing on the ground that he would have pled guilty, Ashrafkhan seeks to vacate his convictions based on allegedly erroneous jury instructions through a supplemental motion under § 2255. (ECF No. 2049.) The government opposed the supplement as well. (ECF No. 2059.)

### A.

The Court must first determine whether the supplemental motion is timely. A little procedural background is helpful.

A § 2255 motion is subject to a one-year statute of limitations. 28 U.S.C. § 2255(f). The limitations period generally begins to run when a defendant's conviction becomes final. *Id*. § 2255(f)(1). Here, Ashrafkhan's conviction became final on or about January 11, 2021, 150 days after the Sixth Circuit denied rehearing on August 12, 2020. *See* Rules of the Supreme Court of the United States –

---

[2] Additionally, while the government's estimate of the guidelines range turned out to be on the low side, Ashrafkhan's 23-year sentence was within the range he was advised that he risked after a conviction at trial.

9

Miscellaneous Order addressing the Extension of Filing Deadlines [COVID-19], 334 F.R.D. 801 (2020) (temporarily extending the period to file a petition for certiorari from 90 days to 150 days for petitions due on or after March 19, 2020). Thus, Ashrafkhan timely filed his initial pro se motion to vacate his sentence on December 27, 2021. (ECF No. 1997.)

Six months later, the Supreme Court decided *Ruan v. United States*, 142 S. Ct. 2370 (2022) ("*Ruan I*"). There, the Court held that the "knowingly or intentionally" mens rea requirement applies not only to the "manufacture, distribute, or dispense" requirement of 21 U.S.C. § 841(a), but also to the requirement that the defendant's acts have not been "authorized." *Id.* at 2375. In the Supreme Court's words, if a defendant produces any evidence that he or she has statutory authorization to dispense or distribute the controlled substances underlying his charges, "the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id.*

Ashrafkhan believed the jury instructions given at his trial were incompatible with this holding. So on June 27, 2023, he filed, through counsel, a "supplemental motion" to vacate his convictions under § 2255. (ECF No. 2049.) This supplement, however, filed more than a year after Ashrafkhan's conviction became final, does not relate back to the filing of his initial motion and therefore is untimely.

To expound, "[a] motion to amend a § 2255 motion is generally governed by the Federal Rules of Civil Procedure," *Clark v. United States*, 764 F.3d 653, 661 (6th Cir. 2014) (citing *Oleson v. United States*, 27 F. App'x 566, 568 (6th Cir. 2001)), which

10

provide that amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings "arose out of the conduct, transaction, or occurrence set out . . . in the original pleading," Fed. R. Civ. P. 15(c)(1)(B). But if the claims do not relate back to the original pleading, "[a] party cannot amend a § 2255 petition to add a completely new claim after the statute of limitations has expired." *United States v. Clark*, 637 F. App'x 206, 209 (6th Cir. 2016) (quoting *United States v. Thomas*, 221 F.3d 430, 436 (3d Cir. 2000)); *see Mayle v. Felix*, 545 U.S. 644, 648, 664 (2005) (holding that new claims are permissible only if they "relate back" to the original filing by being "tied to a common core of operative facts"). This is because once the one-year statute of limitations has expired, allowing amendment or supplementation of a § 2255 motion with additional grounds for relief would defeat the purpose of AEDPA. *Oleson*, 27 F. App'x at 570–71.

Here, there is no dispute that Ashrafkhan's proposed expansion of his § 2255 motion includes a jury instruction challenge that does not overlap at all with the sole claim set forth in his original motion—ineffective assistance of counsel during plea negotiations. Thus, there is no dispute that the supplemental motion is untimely under 28 U.S.C. § 2255(f)(1).

But that does not resolve the issue. Ashrafkhan maintains that, whether or not relation back applies to his new claim, it is § 2255(f)(3) and not § 2255(f)(1) that provides the limitation period for his *Ruan*-based claim. § 2255(f)(3) allows a defendant one year within which to assert a claim based on a right when "that right has been newly recognized by the Supreme Court and made retroactively applicable

11

to cases on collateral review." 28 U.S.C. § 2255(f)(3). And, says Ashrafkhan, he filed his supplement within one year after the decision in *Ruan*—a decision he believes announced a new substantive rule that is applicable on collateral review because it "narrowed the scope of § 841 by interpreting its terms and holding that the statute's *mens rea* applies to authorization." (ECF No. 2049, PageID.21259, 21265.)

But Ashrafkhan provides little legal support for his argument. Indeed, the Supreme Court did not direct that *Ruan* should apply retroactively to cases on collateral review, and the Sixth Circuit has yet to hold that *Ruan* applies retroactively. *See In re Conzelmann*, 872 F.3d 375, 377 (6th Cir. 2017) ("[U]nder *Tyler v. Cain*, 533 U.S. 656 (2001), 'a new rule is not made retroactive to cases on collateral review unless the Supreme Court holds it to be retroactive.'" (quoting *Tyler*, 533 U.S. at 663)); *see also In re Fata*, No. 23-1269, 2023 U.S. App. LEXIS 20603, at *2 (6th Cir. Aug. 8, 2023) (finding that, for purposes of evaluating the propriety of a second or successive motion to vacate under § 2255(h)(2), "*Ruan* involved a question of statutory interpretation" and "did not announce a new rule of constitutional law made retroactively applicable to cases on collateral review"). Thus, it is anything but clear that the limitation period here is controlled by § 2255(f)(3).

The Court recognizes, however, that while the government raised the timeliness issue in its response brief, it found addressing the merits to be the easier path. (ECF No. 2059, PageID.21308.) According to the government, even if Ashrafkhan's *Ruan*-based claim were considered timely, it does not entitle him to relief. The Court agrees and thus will briefly address the merits.

12

## B.

Ashrafkhan seeks to vacate his convictions on the ground that the jury instructions with respect to the mens rea requirement of § 841(a) were erroneous under *Ruan*. He complains about the following instruction:

**Count 1: Distribution of Controlled Substances: Definition**

(1) The underlying crime alleged to have been the goal of the Conspiracy in Count 1 is unlawful distribution of controlled substances (specifically by writing illegitimate prescriptions).

(2) To prove that a conspiracy existed, it is not necessary for the government to prove that the conspiracy was successful or that its object was actually achieved. What *would* be required in order to prove that the object crime, alleged to be the aim of the conspiracy in Count 1, was committed? The following things would have to be proved:

> (A) That a person created (or assisted another in the creation of) a prescription for a controlled substance which was then transferred to another person. A prescription may be "created" either by the act of one person or by the actions of two (or more) people who knowingly and intentionally aid each other in doing so.
>
> (B) That the prescription was issued outside the course of professional practice and for no legitimate medical purpose; and
>
> (C) That the person creating the prescription (or assisting another in doing so) acted knowingly and intentionally, and not in good faith.

(3) The term "knowingly," as used in these instructions to describe the alleged state of mind of a defendant, means that he or she was conscious and aware of his or her action, realized what he or she was doing or what was happening around him or her, and did not act or fail to act because of ignorance, mistake, or accident.

13

## **Law Applicable to Doctors**

(1) Defendants ADELFO PAMATMAT and JOHN GERALT are licensed doctors, charged in Count One of the indictment with conspiracy to illegally distribute controlled substances.

(2) A doctor may not be convicted when he merely dispenses controlled substances in good faith to patients in the regular course of professional practice. Only the lawful acts of a doctor, however, are exempted from prosecution under the law.

(3) In order to sustain its burden of proof under Count One, the government must prove beyond a reasonable doubt that the defendant doctor knowingly and deliberately conspired to distribute a controlled substance and did so *"other than in good faith in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States."* A doctor may not be convicted if he merely made an honest effort to treat his patients in compliance with an accepted standard of medical practice.

(4) A controlled substance is distributed by a doctor in the usual course of his professional practice and therefore, lawfully, if the substance is distributed by him in good faith in medically treating a patient. "Good faith" in this context means good intentions and the honest exercise of good professional judgment as to a patient's medical needs. "Good faith" connotes an observance of conduct in accordance with what the doctor should reasonably believe to be proper medical practice. A defendant need not prove that he was acting in good faith; rather, the government bears the burden of proving that a defendant was not acting in good faith.

(5) In determining whether or not the defendant acted in good faith in the course of a medical practice, you may consider all of the evidence in the case which relates to that conduct, including opinion testimony.

(6) Unless you find beyond a reasonable doubt that the conduct charged in Count One of the indictment was not done in good faith in the usual course of a medical practice, you must acquit the defendant of that charge.

(ECF No. 1155, PageID.8062–8065.) The instruction, says Ashrafkhan, described an objective and not subjective mens rea standard as is now required by *Ruan*. (ECF No. 2049, PageID.21265.)

Ashrafkhan acknowledges that he did not raise a jury instruction error on direct appeal. Thus, to overcome this procedural default, Ashrafkhan must demonstrate either "cause" and actual "prejudice," or that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998). The Court, again, finds it unnecessary to determine whether Ashrafkhan has shown cause because he has not shown prejudice (and makes no attempt to show actual innocence).

Ashrafkhan is correct that, after *Ruan*, in order to convict a medical practitioner who is authorized to distribute or dispense controlled substances of a violation of 21 U.S.C. § 841(a)(1), the government has to prove that the practitioner knowingly or intentionally distributed or dispensed an unauthorized prescription. Thus, the government acknowledges that the above instruction on the "law applicable to doctors" should not be given post-*Ruan*. But, says the government, this instruction applied only to the two medical doctor defendants and not to Ashrafkhan, who is not a medical doctor and is not authorized to issue controlled substance prescriptions. (ECF No. 2059, PageID.21310.)

Resisting this conclusion, Ashrafkhan argues that he "must have the specific intent that the doctors he employs act outside of the scope of their prescribing authority in order to sustain a conviction for conspiracy." (ECF No. 2049, PageID.21270.) But the holding in *Ruan* applied to substantive drug-distribution

15

charges under 21 U.S.C. § 841(a) and not to conspiracy charges under 21 U.S.C. § 846. *See United States v. Ruan*, 56 F.4th 1291, 1299–1302 (11th Cir. 2023) (per curiam) ("*Ruan II*"); *see also Williams v. United States*, No. 20-55, 2022 U.S. Dist. LEXIS 206272, at *7 (E.D.N.C. Nov. 14, 2022) (denying motion to amend § 2255 petition to add a claim under *Ruan* because *Ruan* "did not introduce a new scienter standard for all prosecutions under 21 U.S.C. § 841. Instead, the change in scienter requirement applies only to 'the state of mind that the Government must prove to convict' a doctor of violating 21 U.S.C. § 841" (citation omitted)).

On remand from *Ruan I*, the Eleventh Circuit declined to overturn the defendant's conviction under § 846, even though the jury was incorrectly instructed on § 841. *Ruan II*, 56 F.4th at 1299. The jury had been told that, to convict under § 846, the government must prove: (1) two or more people in some way agreed to try and accomplish a shared unlawful plan; (2) the plan was to distribute or dispense controlled substances; and (3) the defendant knew the unlawful purpose of the plan and willfully joined it. *Id*. The jury was further instructed that "a person acts with willfulness only when they act 'voluntarily and purposefully . . . to do something the law forbids.'" *Id*. (omission in original).

At Ashrafkan's trial, the jury was similarly instructed, utilizing the standard Sixth Circuit jury instruction on conspiracy. (ECF No. 1155, PageID.8058.) More specifically, the instructions made clear that to convict Ashrafkan of conspiracy to distribute controlled substances, the jury had to find that he knowingly and voluntarily joined a drug conspiracy, knowing its main purpose (unlawful distribution

16

of controlled substances by writing illegitimate prescriptions), and intending to achieve its goals. (*Id.* at PageID.8060.) And, in the deliberate ignorance instruction, the jury was told that "[c]arelessness or negligence or foolishness . . . is not the same as knowledge and is not enough to convict." (*Id.* at PageID.8071.) Taken together, the instructions adequately informed the jury that the government had to prove Ashrafkhan had actual knowledge that he was joining a conspiracy to unlawfully distribute controlled substances through illegitimate prescriptions. *See United States v. Hofstetter*, 80 F.4th 725, 731–32 (6th Cir. 2023) (finding no plain error in § 846 charge where district court instructed the jury they had to find that defendant "combine[d], conspire[d], confederate[d], and agree[d] . . . to knowingly, intentionally, and without authority distribute, or cause to be distributed, outside the usual course of professional practice and not for a legitimate medical purpose," a controlled substance (alterations and omission in original) (emphasis omitted)).

Thus, the Supreme Court's holding in *Ruan* does not affect Ashrafkhan's conspiracy conviction.

And even assuming error in the instructions, the Court cannot find it caused actual prejudice. Ashrafkhan argues that "[h]ad the jury been correctly instructed that subjective intent for the prescriptions to be issued outside of the doctors' prescribing authority was required, it is highly likely that it would have found Dr. Ashrafkhan not guilty." (ECF No. 2049, PageID.21275.) The Court disagrees. As described in the government's response brief and the Sixth Circuit opinions on direct appeal, there was overwhelming evidence presented at trial of the issuance of

17

knowingly unauthorized prescriptions and of Ashrafkhan's knowledge of them. "The jury heard testimony that Ashrafkhan was the 'godfather' of the entire drug-distribution conspiracy, and that he 'r[a]n everything.'" *Ashrafkhan*, 821 F. App'x at 441 (alteration in original). Other evidence included:

- Testimony from Verdell Lovett, a Compassionate marketer, that Ashrafkhan knew that Lovett was selling Oxycontin pills on the street.

- Testimony from Dr. Ravi Iyer that after he told Ashrafkhan he did not want to participate in the "patient parties"[3] anymore because "we're not doing any real medicine out here," Ashrafkhan told Iyer to come into the office once or twice a week to sign off on stacks of charts filled out by unlicensed medical graduates. Iyer further testified that Ashrafkhan directed him to write OxyContin prescriptions for patients he never saw and to pre-sign blank prescription pads. Ashrafkhan also "embraced" Iyer's suggestion about altering the patient charts to make them "appear more legitimate."

- Testimony from Iyer, corroborated by the search warrant seizure of pre-signed prescriptions, that Ashrafkhan paid his doctors to pre-sign prescription pads, which could then be used to prescribe controlled substances without the doctor present.

- Testimony from a licensed pharmacist that he consistently paid Ashrafkhan kickbacks, or "gifts," for referring patients to the pharmacist's pharmacy.

- Testimony from an unlicensed medical graduate that he had an agreement with Ashrafkhan to present fake patient charts to Compassionate. A Compassionate doctor would sign controlled substance prescriptions and the fake charts as if he had actually seen the patient, and the "patient visits" were billed.

---

[3] As described by the Sixth Circuit, "[c]ompassionate marketers would also organize 'patient parties,' where numerous fake patients would gather at one location so that Compassionate doctors could write fraudulent prescriptions en masse." *Ashrafkhan*, 821 F. App'x at 432.

18

(ECF No. 2059, PageID.21303–21306); *see also Ashrafkhan*, 821 F. App'x at 433 ("Witnesses testified that Ashrafkhan would personally pay Compassionate's marketers in cash or checks, that Ashrafkhan knew that his doctors prescribed the pain medication fraudulently, and that he would even encourage them to create fake patient charts or other documents to give Compassionate the semblance of legitimacy.")

In sum, the *Ruan* decision does not warrant vacating Ashrafkhan's convictions.

## IV.

For all of these reasons, Ashrafkhan's motion to vacate (ECF No. 1997) and supplemental motion to vacate (ECF 2049) are DENIED and his motion to expand the record to include his affidavit (ECF No. 1998) is GRANTED.

SO ORDERED.

Dated: January 3, 2024

                                                 s/Laurie J. Michelson
                                                 LAURIE J. MICHELSON
                                                 UNITED STATES DISTRICT JUDGE